**B.M.L. CORP. et al.**

v.

**GREATER PROVIDENCE DEPOSIT CORP. et al.**

83–573–Appeal.

Supreme Court of Rhode Island.

July 10, 1985.

John A. MacFadyen, III/Edward Gomes, Providence, for plaintiffs.

Richard W. MacAdams (Adler Pollock & Sheehan Incorporated), Providence, for defendants.

## OPINION

KELLEHER, Justice.

On June 14, 1978, Crescenzo A. Pompeii (Pompeii), individually and as president of three Rhode Island corporations, to wit, B.M.L. Corp.; Cutty, Inc.; and Yawgoo, Inc., entered into an agreement with Joseph Roderick (Roderick) of Bristol, Rhode Island, to sell to Roderick all of the assets involved in the operation of the Bristol Motor Lodge, including its liquor license and banquet hall, for a price of $925,000. One corporation, B.M.L. Corp., held title to the real estate. The second, Cutty, Inc., held a B–Tavern liquor license and apparently conducted the banquet-hall business.[1] The agreement acknowledged payment by Roderick of $5,000 and gave him two options for paying the balance.

One option would be by the payment of $920,000 cash. The second option would be by the obtaining of a loan commitment of approximately $790,000 within seventy days of the date of the agreement, with the balance to be paid by a $130,000 twenty-year mortgage note to Pompeii with interest payable at a rate of 10 percent per annum. If for any reason Roderick were to be unable to obtain the commitment within seventy days, the agreement would become null and void with the deposit to be retained by Pompeii as liquidated damages. If the commitment was not forthcoming because of a defect in title, the deposit was to be returned to Roderick.

The record indicates that in late August 1978 Roderick's accountant sent Pompeii a letter which began,

"Attached is a letter of commitment from Greater Providence Deposit Corp. notifying the buyer, Joseph Roderick, that the bank has arranged for $1 million of financing which includes among other items the outright purchase of your business as referred to in a previously signed buy and sell agreement."

The accountant then went on to stress that the "final details" relating to the financing were being worked out. He assured Pompeii that within the next ten days he would be notified of the timetables and the requirements for holding a satisfactory closing regarding their transaction.

In a letter directed to the attention of Roderick and the accountant, Greater Providence Deposit Corp. (GPDC), through its vice president, wrote:

"This letter is to inform you that arrangements have been made to finance the purchase of property located at 400 Metacom Avenue, Bristol, presently known as the Bristol Motor Lodge.

"Although final terms and conditions have yet to be finalized, said financing will take the form of a $350,000.00 SBA guaranteed loan from the Greater Providence Deposit Corporation, subject to a $650,000.00 first mortgage with another lending institution. * * * Final details

---

1. Yawgoo's status as a party to the sales agreement is, on this record, a mystery.

are presently being arranged between lending institutions and the Small Business Administration * * *."

Sometime after receiving the accountant's letter, Pompeii took the Bristol Motor Lodge off the selling market and canceled all the bookings for the banquet hall. Later, Pompeii fell in arrears on his mortgage payments, and his mortgagor, GPDC, foreclosed on the mortgage, bought the property at an auction sale, and later sold it. The record contains a suggestion that sometime in April 1981 Roderick filed a voluntary petition seeking relief under chapter 7 of the United States Bankruptcy Code.

In December 1980 Pompeii instituted this suit, seeking damages in the amount of $2 million from Roderick and GPDC. He is now before us challenging the granting by a Superior Court justice of GPDC's motion for summary judgment.

Throughout this litigation Pompeii has consistently maintained that GPDC is liable to him in damages because he relied on the lender's funding commitment letter to Roderick. This reliance caused him to remove his property from the real estate market and cancel the bookings that were pending at the banquet hall. Greater Providence Deposit Corp., on the other hand, maintains that even though it might have served as a source of funding for the purchase of the motor lodge, it made no commitment, nor did it have any contractual relationship with Pompeii.

■ Pompeii, in faulting the trial justice's grant of the summary-judgment motion, argues that he should be allowed to invoke the doctrine of promissory estoppel and recover damages from GPDC. Such a position brings to mind *East Providence Credit Union v. Geremia*, 103 R.I. 597, 601, 239 A.2d 725, 727 (1968), where this court adopted the theory of promissory estoppel. The doctrine of promissory estoppel provides:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." 1 Restatement (Second) *Contracts* § 90 at 242 (1981).

Thus, we must first determine if GPDC's so-called commitment qualifies as a promise that the promisor "should reasonably expect to induce action or forbearance on the part of * * * a third person." An essential part of the promissory-estoppel doctrine is the necessity that the promise be made for the purpose of inducing the promisee or the third person to forbear. *Hayes v. Plantations Steel Co.*, —— R.I. ——, ——, 438 A.2d 1091, 1095 (1982).

In *State v. First National Bank of Ketchikan*, 629 P.2d 78, 81–82 (Alas.1981), the bank made a short-term loan to a borrower on the belief that the borrower's loan application had been approved by a state agency whose duty it was to assist small businesses. In a civil action brought by the bank against the state, the court ruled that since the "promise was understood to be conditional on obtaining Jones's [the borrower's] cooperation in executing the necessary loan documents," the promise would not be enforced. *Id.* at 81.

■ By instituting suit against GPDC, Pompeii was required to establish the first element of promissory estoppel, the existence of a clear and unambiguous promise. The terms of the promise must be certain, for there can be no promissory estoppel without a real promise. *Metropolitan Convoy Corp. v. Chrysler Corp.*, 58 Del. 286, 290, 208 A.2d 519, 521 (1965). Promissory estoppel cannot be based upon preliminary negotiations and discussions or on an agreement to negotiate the terms of a contract. *Keil v. Glacier Park, Inc.*, 188 Mont. 455, 463, 614 P.2d 502, 506 (1980).

■ Here the financing arrangements described in GPDC's letter to Roderick were expressly made conditional upon the approval of another lending institution and the Small Business Administration (SBA).

Consequently, we have no hesitancy in holding that the "promise" made by GPDC does not come close to being a promise that would reasonably induce forbearance on the part of Pompeii. This is particularly true since no loan could be made without Roderick's cooperation. Not one word is present in the document relating to the rate of interest to be charged by the first mortgagor on the $650,000 mortgage or what the SBA would demand of Roderick before it would guarantee GPDC's proposed loan of $350,000. In *J. Koury Steel Erectors, Inc. of Massachusetts v. San-Vel Concrete Corp.*, 120 R.I. 360, 387 A.2d 694 (1978), the court stressed that if no promise was made, the doctrine of promissory estoppel is inapposite, and what was said in *Koury* applies equally well to the case at bar.

Pompeii's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.